**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ARTHUR YATSKO,

    *Plaintiff*,

v.

CITY OF NORTH PORT, FLORIDA,

    *Defendant*.

Case No. 8:26-cv-01684

## COMPLAINT & JURY DEMAND

1.    Plaintiff Arthur "Art" Yatsko challenges the City of North Port's unconstitutional zoning prohibition on single-family homes in his single-family neighborhood. Art brings this as-applied civil-rights action to vindicate his rights under the United States Constitution and to restore his ability to use his property for his own traditional, ordinary, and harmless use. Art wants to build a modest home on his property that harms no one and is consistent with the surrounding community. The Constitution guarantees his right to do so.

### INTRODUCTION

2.    Twenty years ago, Art—a small-business owner and real-estate professional from Rhode Island—purchased a lot in North Port. Like so many others, Art dreamt of a modest retirement in a residential neighborhood in Florida. For decades he has been working toward that dream, and his purchase of the lot was another step toward making it a reality. But just as Art was ready to start

construction—literally as he was meeting with builders about the project—he learned that North Port has made his dream impossible. It had rezoned Art's quiet neighborhood of single-family homes to prohibit building additional single-family homes.

3.    All Art wants to do is precisely what every one of his neighbors in North Port has done—have a modest home. Art's plan to build a single-family home would have been indistinguishable from every developed single-family lot around him. There are nearly a hundred single-family homes like what Art envisions in the rezoned neighborhood. And yet, it is precisely that use—the only one that currently exists in the neighborhood—that the City now prohibits. That's because North Port has big redevelopment ambitions: It hopes that by rezoning the neighborhood to prohibit single-family homes, businesses will suddenly be drawn to this quiet, residential neighborhood of narrow side streets.

4.    The City overhauled its zoning code in the hopes of increasing its tax base by transforming residential land into mixed-use commercial hubs. But it chose to do so in an irrational way: not by allowing commercial uses among residential uses, but by prohibiting single-family residential uses. This makes little sense as Art's neighborhood lacks the conditions and infrastructure to support the envisioned commercial hub, something the City's own study acknowledged. In the study, the City noted various unaddressed barriers to its vision. The rezoning cannot plausibly achieve its stated goal. What it does, instead, is infringe on Art's rights.

5.      By prohibiting Art from building his dream retirement home—a harmless use entirely compatible with the surrounding community—the City of North Port has infringed on Art's rights under the Fourteenth Amendment to the U.S. Constitution. The Supreme Court has recognized that municipalities violate the Constitution when they prevent a property owner from using his property for the only or most appropriate use. *See Nectow v. City of Cambridge*, 277 U.S. 183 (1928). And that is precisely what North Port has done to Art. North Port has left Art with no options—no feasible alternative uses or available variance procedures.

6.      It's irrational—and unconstitutional—for North Port to prohibit single-family housing in a community comprised entirely of single-family housing. Art asks this Court to declare the prohibition unconstitutional as applied to his property and to enjoin the City from enforcing it against him.

JURISDICTION AND VENUE

7.      Plaintiff Arthur "Art" Yatsko brings this civil-rights lawsuit under the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

8.      This Court has federal-question jurisdiction over this action under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343.

9.      Plaintiff seeks declaratory and injunctive relief against the City's enforcement as applied to his property of the prohibition on single-family homes in areas zoned "Corridor (COR)." *See* North Port, Fla., Unified Land Development

Code (hereinafter "ULDC") tbl. 3.2.4.1 (noting "Single-Family Detached" uses are prohibited in COR-zoned areas).

10.    Venue lies in this Court under 28 U.S.C. §§ 1391(b)(2) and (c)(2) because the property that is the subject of this action and the City of North Port are located within Sarasota County.

## PARTIES

11.    Plaintiff Arthur Yatsko is a citizen of the United States and a resident of Warwick, Rhode Island. Since 2006, he has owned the property on parcel 0967060917 on Kumquat Avenue in North Port, Florida.

12.    Defendant the City of North Port, Florida is a municipality in Sarasota County that is organized under the laws of Florida.

## FACTUAL BACKGROUND

### *Art, A Small-Business Owner, Works Toward His Dream Of A Modest Retirement Home In North Port.*

13.    Art is a 67-year-old small-business man ready to retire.

14.    Art has spent his adult life earning a living in real estate and small-scale development.

15.    In Rhode Island, where he currently resides, he owns various small investment properties that he either rents at affordable prices to tenants—including families and refugees—or that he is in the process of revamping to offer for that purpose.

4

16. He's bought and sold enough properties throughout his career that he knows well the kinds of zoning and regulatory issues to consider before purchasing a parcel. He understands, and knows how to address, barriers to modest residential construction projects.

17. But now that he's getting older (and his wife is asking him to) Art is taking concrete steps toward the retirement he's always dreamed of.

18. A New England resident, he has spent the last twenty years planning for a warmer retirement in Florida—specifically in North Port.

19. In 2006, Art bought a buildable residential lot on Kumquat Avenue in North Port, intending to construct his retirement home there when the time was right.

20. The area appealed to Art because of its suburban character. He liked that it was a quiet, simple residential neighborhood.

21. When he purchased the property, Art was not a naïve buyer who misread or misunderstood the zoning for the property he purchased.

22. He purchased the property because it was appropriate for what he needed. His expectations were reasonable.

23. Back in 2006, when Art spotted an ad for lot auctions in North Port, he did his homework, studied the area, and worked with a realtor to select what he thought was the ideal lot: the right zoning, good sun exposure for the windows and swimming pool he envisioned, and convenient access to the highway.

24.     He bid on two lots and secured parcel 0967060917, his preferred of the two lots, on Kumquat Avenue for $42,000.

25.     Since purchasing the lot, Art has consistently paid property taxes on the property.

26.     Since purchasing the lot, Art has periodically visited it to ensure everything has remained in order.

27.     Art chose North Port because it was affordable and not overdeveloped.

28.     In light of his experience in the industry, Art has a concrete and realistic plan for the property—to build a modest home.

29.     Art's plan for the lot is simple: a one-story home of about 1,300–1,400 square feet, with a garage, a space to park a boat, and two suites—a master suite for himself and his wife and a guest suite with its own bath for family and friends.

30.     He envisions spending time at the home with his wife and family—a hub to be enjoyed with kids and grandkids.

31.     With retirement looming, Art decided it was time to begin construction. In late 2024, Art flew down to North Port to start the construction process.

32.     During this trip, Art met with two builders at the lot to discuss his plans and to get quotes for the home.

33.     Art has budgeted $200,000 for construction costs that he'll pay in cash.

34. But while he was meeting with builders, a neighbor approached Art with some unfortunate and unforeseen news: because of a zoning change, additional single-family homes are no longer permitted in the neighborhood.

*Kumquat Avenue And The Surrounding Neighborhood Are The Perfect Quiet Community For Art.*

35. Learning that single-family homes are no longer permitted in the neighborhood shocked Art—after all, he chose North Port and the Kumquat Avenue neighborhood specifically because they were ideal for this plan.

36. North Port is a largely residential City—a middle-class suburb with shopping malls, business parks, and residential areas.

37. Kumquat Avenue—where Art's lot is located—is, like the rest of the neighborhood surrounding it, composed entirely of single-family residential uses. His envisioned home is entirely consistent with the existing neighborhood.

38. The residential areas in North Port, including Kumquat Avenue and the neighborhood around it, consist of tightly packed houses and narrow streets lined with basketball hoops and devoid of sidewalks.

39. On Kumquat Avenue there are approximately twenty single-family homes and no other development. The rest of the street is composed of undeveloped lots, many owned by others similar to Art, who bought the lots with the intention of building homes when the time is right. Here's an aerial view of a portion of Kumquat Avenue taken from the Sarasota County Property Appraiser Parcel Map.



40.     The parcel immediately to the west of Art's lot has a single-family home on it.

41.     The entire block is similar—comprised entirely of single-family homes and lots pre-platted for single-family residential uses.

42.     The same is true of the surrounding neighborhood. The streets to the north and south of Kumquat are similarly developed, with single-family residences scattered among undeveloped lots pre-platted for single-family residential uses. Here's an aerial view of a portion of Kumquat Avenue and the surrounding area taken from the Sarasota County Property Appraiser Parcel Map.



43.     Kumquat Avenue has a suburban, almost quasi-rural, atmosphere perfect for what Art envisions. This is what the neighborhood looks like:

8







44. The neighborhood is a quiet suburban community of single-family homes.

45. There are no existing mixed-use buildings in the neighborhood.

46. There is no significant foot traffic in the neighborhood. It is automobile-dependent.

47. The streets are narrow, having no transit infrastructure to support high-intensity and mixed uses in the neighborhood.

48. And because the neighborhood is exclusively single-family homes, there is insufficient density to support or sustain significant commercial activity in the neighborhood.

49.     Upon information and belief there is no commercial activity in the neighborhood.

50.     There is no commercial development in the neighborhood.

51.     There are no existing multi-family residential uses in the neighborhood.

52.     Kumquat Avenue is a narrow street with limited parking and no sidewalks.

53.     The undeveloped lots between existing houses are too small to accommodate most businesses, mixed-uses, or multi-family residential developments.

54.     The lots on Kumquat Avenue and the surrounding areas were pre-platted for single-family housing.

55.     It's unrealistic to think the neighborhood could support the commercial development North Port demands. Unlike Art's desired single-family home, for which the neighborhood was platted, the neighborhood's infrastructure and character are ill-suited for businesses like nightclubs, driving ranges, or indoor shooting ranges.

56.     Unless the entire neighborhood were bulldozed and rebuilt, it could not support any significant amount of traffic, since roads are narrow and parking is limited.

57.     The single-family residential nature of Kumquat Avenue and the surrounding neighborhood aligns well with the rest of the City.

58.     In the spaces between shopping centers, North Port is spotted with country clubs and pockets of residential neighborhoods (like Kumquat Avenue).

11

59.    In the commercial areas North Port has newish shopping centers, business parks, country clubs, big-box stores, and chain restaurants.

60.    The residential areas consist of neighborhoods just like those near Kumquat Avenue—houses with patio furniture and children's toys strewn around on narrow streets with few sidewalks.

***The City Of North Port Has Grand (And Unrealistic) Redevelopment Aspirations.***

61.    North Port, Florida, in Sarasota County, is a primarily residential city near the Gulf Coast. Straddling both banks of the Myakka River, it is one of the fastest-growing cities in the state, now with approximately 90,000 residents—roughly triple its population twenty years ago.

62.    Much of that growth has been driven by homebuyers attracted to North Port's suburban, almost quasi-rural, character and easy access to more urban areas in nearby cities and coastal amenities.

63.    The City has been experiencing steady population growth driven by families, remote workers, and retirees (like Art) who are attracted to North Port's unhurried, breathable atmosphere that rarely feels crowded or busy, and to its lower housing costs.

64.    But despite the benefits this suburban character has brought, the City no longer wishes to be a suburb for the more urban areas nearby.

65.    Until recently, roughly 90 percent of the City's land had been zoned residential. Officials blamed this zoning for the lack of commercial development. And

12

so, North Port officials have been trying to adopt a revamped Unified Land Development Code to allow more commercial development for some years.

66.    The City wanted to increase commercial development to expand its tax base.

67.    According to the City, usually "cities need a minimum of 18% of their land to contain non-residential uses to balance the tax base." (Notably, North Port officials have been somewhat inconsistent about this number, citing needs between 18% and 30%.) And "North Port only ha[d] about 8%, which means residential property owners are paying more in taxes because the City doesn't have enough commercial land to help balance the burden."

68.    So the City rewrote its zoning code. The new zoning map reportedly increases nonresidential land by 61 percent (a functional increase of about 12%).

69.    Officials touted the new Unified Land Development Code (ULDC), which became effective on October 28, 2024, as a way to "rebalance" growth by expanding land available for business so residents could "live, work, and play" within the City.

70.    In the abstract, rezoning to allow increased commercial development may seem like a good idea, except that's not what the rezoning does. Rather than upzoning residential areas to *permit* commercial uses alongside existing residential uses and stopping there, the City went one step further. It rezoned to *prohibit* certain residential uses in the hopes commercial development would fill in the void. It's

13

essentially forcing commercial uses where they don't exist by prohibiting the one use that does exist, single-family houses.

71.    Unsurprisingly, when the plan was up for consideration, many noted the problems with it. In fact, one then-city commissioner opposed the rezoning because she recognized there'd be no guarantee the rezoning would draw commercial activity due to a lack of infrastructure to support commercial development in certain areas. *See* Heather Bushman, *North Port's Long-Debated Code Rewrite Approved. What Does It Mean for Residents?*, Sarasota Herald-Tribune (Aug. 15, 2024), https://www.heraldtribune.com/story/news/local/2024/08/15/north-port-city-commission-passes-long-debated-code-rewrite/74777631007/; Heather Bushman, *New North Port Zoning Could Fix its Tax Base, But Opponents Fear Overgrowth*, Sarasota Herald-Tribune (Mar. 25, 2024), https://www.heraldtribune.com/story/news/local/2024/03/25/opponents-fear-overgrowth-in-north-port-rezone/73024732007/.

72.    Art's neighborhood is among the areas rezoned as part of this project. And it was rezoned to prohibit building single-family homes.

73.    As part of its redevelopment plan, the City has identified several "Activity Centers"—designated areas intended to accommodate higher-intensity and mixed-use development to serve as commercial hubs.

74.    The City seems to believe that by concentrating rezoning efforts around Activity Centers, it can attract investment and catalyze surrounding development. So

14

it has rezoned certain residential areas around the Activity Centers on the theory that proximity to these hubs will make commercial development viable.

75.    Art's property was rezoned, it seems, because of its proximity to one of those Activity Centers—the Gateway Activity Center, which is close to Art's property (about a two-minute drive).

76.    The City has big dreams for this area.

77.    The Gateway Activity Center is located at the interchange of Sumter Boulevard—a major arterial road in the City—and Interstate 75. A hospital is under construction on the southeast quadrant of the interchange.

78.    The City hopes completion of the hospital will spur development in each quadrant of the interchange and parts of the surrounding areas, especially to the southwest (where Art's property is located).

79.    In a study of the Gateway Activity Center plan, North Port explained its hopes that the hospital will attract "hospital-oriented" development into the area—bringing "jobs directly created at the hospital" as well as "complementary services and amenities (such as medical practices, pharmacies, retail outlets, dining options, and hotels)."

80.    But North Port itself seems to recognize how unrealistic this vision is.

81.    The City's own master plan study for the Gateway Activity Center acknowledged that, even with the hospital under construction, there is insufficient market demand in the area to support its hospital-oriented development vision.

82.    The study identified various "barriers" to the vision, most notably that the land to the southwest of the Gateway Activity Center—the land now rezoned for high-density development—was pre-platted for lots to accommodate single-family homes with disparate owners uninterested in aggregating lots for commercial development.

83.    Indeed, the study implicitly acknowledged how unfeasible this vision is by considering alternative development scenarios that better align with the area's more suburban, almost quasi-rural, character.

84.    Technically, although Art's property was part of the rezoned corridor, his property was not included within the study area. (Kumquat Avenue, where his lot is located, is three blocks south of the study area's southern limit—a few blocks further from the hospital than the study area.) But the study's findings are nonetheless equally compelling as to Art's property, as the conditions on Kumquat Avenue are fully consistent with those in the southwestern portion of the study area—pre-platted for residential development with disparate owners who were all rezoned subject to a prohibition on single-family homes.

85.    Despite the City's grand vision, for North Port's residents, its suburban and semi-rural character is the draw—they chose North Port *because of*, not in spite of, that character.

16

*The Rezoning Unconstitutionally Deprives Art Of His Ability To Use His Property For His Own Purposes And Consistently With The Surrounding Community.*

86.    Art bought the property for one purpose: to build a single-family home he could live in when he retired. He can no longer do that.

87.    His neighborhood—a community of single-family homes on a quiet street—was ideal for what he intended to do. Art's envisioned home was perfectly compatible with the surrounding community.

88.    Before the zoning overhaul, the area was zoned residential—just what Art needed for his plans.

89.    No more. The new ULDC that went into effect on October 28, 2024, no longer permits Art to build his dream home, even though the rest of the community is composed exclusively of single-family homes.

90.    The neighborhood—including Art's lot on Kumquat Avenue—was rezoned from residential to "Corridor (COR)," which "allows high-density residential and high-intensity non-residential uses in which non-residential uses may be developed separately or in combination with residential development[.]" ULDC § 3.1.2(D)(2).

91.    The purpose of this rezoning is to transform this quiet community into a mixed-use and commercial hub despite the preexisting prevalence of single-family homes.

17

92.    This is what the area's zoning is currently.



Art's property is highlighted in cyan. The area in magenta is the southern portion of the Gateway Activity Center (AC-3), with the H-symbol marking the location of the new hospital currently under construction. The darker, more muted green areas—including Art's property—are now zoned as high-intensity Corridor (COR).

93.    In COR-zoned areas like Art's neighborhood, the new zoning only allows two types of residential uses as of right—multi-family homes and assisted living facilities of 50-plus beds. ULDC tbl. 3.2.4.1.

94.    In COR-zoned areas like Art's neighborhood, the new zoning only allows single-family attached residences (duplexes)—something Art is not interested in—as special exception residential uses. *Id.* And the special exception application

18

process is onerous and unpredictable. It involves detailed application requirements, is subject to discretionary review, and leaves numerous potential bases for denial.

95. In COR-zoned areas like Art's neighborhood, the new zoning *prohibits* single-family detached uses (single-family homes). *Id.*

96. So when the new zoning went into effect, it produced immediate nonconforming uses across the entire neighborhood of single-family homes.

97. Under the new zoning, Art is permitted to build a variety of commercial uses on his lot.

98. To take a few examples, COR-zoning permits building—as of right—a nightclub (though one prohibited from operating between 10 p.m. and 5 a.m., thus rendering it commercially unviable); a brewery, distillery, or winery; a bank; a funeral home; a radio or television station; or even an indoor shooting range (among other high-intensity uses). *Id.*

99. But Art doesn't want to build any of those permitted uses.

100. Nor would those permitted uses be consistent with the neighborhood.

101. Even putting aside that the neighborhood is comprised entirely of single-family homes and that there are no existing commercial or mixed uses, the permitted uses also presume physical conditions this neighborhood does not have and is unlikely to develop absent complete demolition: pedestrian, traffic, or transit infrastructure or access; and appropriately sized parcels.

102. The permitted uses are also much more disruptive than those existing in the neighborhood. Single-family homes are unlikely to cause traffic or noise issues; but breweries or shooting ranges may. It makes little sense that Art could build a nightclub in the middle of this neighborhood of single-family houses, but not another single-family home.

103. But what Art *cannot* build—neither as of right nor with a special exception—is the one thing that he wants and that is compatible with this community: a modest single-family home.

104. The single-family home that Art wants to build will cause less traffic than permitted commercial uses.

105. The single-family home that Art wants to build will be quieter and less disruptive than permitted commercial uses.

106. The single-family home that Art wants to build will require less parking than the permitted commercial uses.

107. Existing commercial uses in North Port are located on large lots, often on strip malls that can accommodate multiple businesses. There are no lots of such size in Art's neighborhood.

108. Existing commercial uses in North Port have large parking lots. There is very limited parking in Art's neighborhood, and limited space to add enough to accommodate most commercial uses.

109. Existing commercial uses in North Port are located along wide, major roads that can accommodate heavy traffic. Art's neighborhood is composed of narrow side streets with single lanes of traffic in each direction.

110. Art's neighborhood is made up entirely of single-family homes and does not have any of the features common among existing commercial uses in North Port.

111. There should be nothing illegal about building a single-family home in a community of single-family homes. But this rezoning has made it so.

112. The COR-zoning's prohibition on new single-family homes deprives Art of the use of his property for his own traditional, ordinary, and harmless use.

113. It deprives him of his ability to use his property for beneficial development that's entirely consistent with the surrounding area.

114. It deprives him of his ability to use his property for the most fundamental use there is—to live modestly and comfortably.

115. And it does so in an irrational way. The purpose of the COR-zoning is to encourage mixed-use and commercial development. But banning the construction of single-family homes in a suburban neighborhood won't make businesses magically appear in their place.

116. Real economic development requires businesses to actually want to move into North Port neighborhoods and, even then, it's hard to imagine former residential streets like those that make up Art's neighborhood transforming into commercial hubs.

117.   As the City's own study noting the "barriers" to development in the area suggested, many of these formerly residential lots are too small and poorly situated to make sense for businesses.

118.   Art's lot, like most of the undeveloped lots in the neighborhood, is approximately 10,000 square feet, significantly smaller than commercial lots accommodating businesses of the same types now allowed in the neighborhood. For example, medical, dental, and certain veterinary offices are permitted in COR-zoned areas, but offices of those types on Sumter Boulevard are on lots larger than 40,000 and 50,000 square feet according to the Sarasota County Property Appraiser Parcel Map. Similarly, restaurants are also permitted uses, but restaurants like Waffle House, Taco Bell, and McDonald's on Sumter Boulevard are on lots larger than 30,000 and 40,000 square feet according to the Sarasota County Property Appraiser Parcel Map.

119.   The City's vision for this neighborhood makes little sense: restaurants, offices, and boutique shops scattered along narrow and pedestrian-less side streets that are otherwise lined with single-family homes.

120.   The COR-zoning's prohibition on additional single-family housing cannot plausibly serve its purported purposes of increasing commercial development and the resulting tax base. Instead, it merely strips Art of the only use he's ever wanted and that is compatible with the neighborhood.

121. The way for North Port to promote more commercial development is to pass ordinances that allow for more commercial development—not to mandate what's desired, irrespective of its feasibility, and prohibit other, otherwise appropriate, uses.

122. Indeed, in the more than a year and a half since the rezoning went into effect, none of the commercial or mixed-use development the City envisions has materialized. Art's neighborhood remains comprised entirely of single-family residential uses and undeveloped lots pre-platted for such uses.

123. If North Port wanted to create more land opportunities for businesses, it could have merely allowed more uses rather than prohibiting existing ones.

124. Instead, the overhaul is producing the opposite of what North Port intended: a landscape of mostly vacant lots where single-family homes like Art's dream are no longer welcome and where businesses are likely to never appear.

125. In sum, North Port has exceeded its zoning power. Although North Port has the power to zone, it is a power that has limits. North Port cannot prohibit a compatible use (in fact, the only existing use) in a community in order to force an unrealistic vision of the community.

### Art Has No Viable Alternatives.

126. Art has no viable alternatives for what to do with his lot now that the rezoning prohibits him from using it for his intended purpose.

127. After he learned of the zoning change, Art went straight to City Hall, where planning staff confirmed that he had missed the opportunity to build under the prior zoning.

128. Having become familiar with zoning procedures throughout his career, Art was stunned to learn that the zoning had changed without him being notified and that, under the new zoning, the zoning board wasn't even allowed to grant him a variance.

129. Art doesn't want to sell the property he's invested in for two decades. He wants to build his dream home. So, he's thought through alternatives—none is viable.

130. He considered residential alternatives to a single-family home. But he's not interested in those.

131. The City suggested he could build a duplex. But a two-family structure is not permitted as of right in COR-zoned areas. Duplexes are only available as special exception uses, which would require a separate approval process. This is an expensive and time-consuming process with no guarantee of success.

132. And, more fundamentally, Art doesn't want a duplex. He bought the property to build a home for his personal use, not a rental investment. Nor is he interested in "gaming" the zoning by building a duplex and using both sides as if it were one house.

133. Even if he were open to building a duplex, it would increase costs—requiring otherwise unnecessary doubles of everything on the same footprint.

134. Proceeding on a use he does not want, through a costly and lengthy approval process that may deny him, is not a genuine alternative.

135. A triplex is just as flawed an alternative. As with a duplex, a triplex simply isn't what Art wants to build.

136. Although Art could theoretically build a triplex as a permitted multi-family use, that option is practically unavailable since the lot is too small to adequately accommodate a triplex (or other multi-family structure, for that matter) and the costs would be substantially greater.

137. Commercial and mixed uses aren't an option either.

138. Art bought the lot to build a home, not a business.

139. Even if Art were interested in building a commercial or mixed-use structure on the property, there are practical barriers to doing so.

140. Because the lot was pre-platted for residential use, it is too small for many such uses. And other zoning requirements likely pose additional legal constraints on such development. That may be why zoning officials verbally told Art that it's possible that the only thing he may be able to build (without expensive and time-consuming special permission) is an office—something he has no interest in.

141. The simple fact is that the new Unified Land Development Code does not allow Art any viable options.

142. Under the ULDC, Art is not eligible to apply for a variance to build his home. The type of variance he would need "may not [be] request[ed for] a variance to use, density, or [intensity]." ULDC § 2.2.18(B)(2).

143. In evaluating such variance requests, "[t]he City shall not consider the nonconforming site conditions of neighboring lands, buildings, or other structures in consideration of variances." ULDC § 2.2.18(D).

144. In other words, Art can't request a variance for what he wants and, even if he could, he couldn't argue that his proposed use would be compatible with the (now "nonconforming") residential community if he did.

145. Even if that were not the case, Art still couldn't get a variance because the criteria he'd have to meet would weigh against him.

146. There are no "[s]pecial conditions . . . that are particular to the land, building, or other structures for which the variance is sought, and which do not generally apply to other lands, buildings, or structures in the same district." ULDC § 2.2.18(D)(1).

147. Nor is the "[c]ondition for which the applicant request[s] the variance [] not so general or recurrent, necessitating an amendment to the ULDC." ULDC § 2.2.18(D)(8).

148. Such conditions are ones Art can't meet. There is nothing "particular" to his land that would "not generally apply to [the] other lands, buildings, or structures"

26

in his neighborhood. And he would be asking for a variance precisely because of the now-nonconforming homes in the neighborhood.

149.    In light of this, it's unsurprising that zoning officials told Art he couldn't apply for a variance to build a single-family home.

150.    Zoning officials have confirmed—*in writing*—that Art cannot build a single-family home on his lot. When Art emailed with the City's Planning and Zoning Division to confirm his understanding of what options were available, the City responded that he was "correct" that "single[-]family residences are not permitted in COR." In a follow-up email, the City further confirmed that "[a] variance cannot be granted for the construction of a single-family home."

<strong>INJURY TO PLAINTIFF</strong>

151.    Art's long-term dream has been to retire with a modest home in Florida. Decades ago, he started working toward that dream—he found and purchased the perfect property, parcel 0967060917 on Kumquat Avenue in North Port. He's done everything right, but just as he was preparing to build, he learned that the City's recent rezoning made his dream impossible, thus infringing on his constitutionally protected property rights. But for the rezoning, Art would be building his home right now.

152.    One of the main reasons Art specifically chose to purchase parcel 0967060917 is because the then-extant zoning allowed him to build a single-family home that would meet all of his needs. He specifically chose the lot because he could and would comply with all requirements to build his dream home.

27

153. But that is no longer true. Because of the rezoning, Art can no longer build the home, meaning that the property, for Art, is worthless.

154. Because of the rezoning, Art can no longer use his property as he sees fit.

155. Under the rezoning, Art's lot is zoned COR, where single-family homes are prohibited.

156. The prohibition on building single-family homes in COR-zoned areas irrationally deprives Art of his right to use his property for its traditional, ordinary, and harmless use—a modest home.

157. The prohibition on building single-family homes in COR-zoned areas irrationally deprives Art of what is perhaps the most historically grounded right—the freedom to build a home on one's land. *See* 1 William Blackstone, *Commentaries* *129 (describing private property as one of the three "principal or primary" rights, along with personal security and personal liberty); 2 William Blackstone, *Commentaries* *4–5 (describing earliest uses of property for housing).

158. The prohibition on building single-family homes in COR-zoned areas irrationally deprives Art of his right to use his property in a manner that is compatible with the surrounding community.

159. Indeed, the prohibition on building single-family homes in COR-zoned areas irrationally deprives Art of his right to use his property for a use that is the *only* existing use in the neighborhood.

160.    But for the prohibition on building single-family homes in COR-zoned areas, Art would be in the process of building his home right now.

161.    Art has a concrete, fully-formed plan for the property: a modest home of approximately $200,000 paid in cash.

162.    Art has taken affirmative steps—like identifying builders and soliciting quotes—toward construction that the rezoning has halted.

163.    Art has the financial resources and regulatory and industry expertise to build his home. But the prohibition on single-family homes in COR-zoned areas has halted his plans.

164.    The delays in construction resulting from the prohibition have also cost Art financially since the costs of building materials have increased since Art learned of the rezoning. Building his home is more expensive because of the delay caused by the prohibition.

165.    Since the rezoning went into effect on October 28, 2024, it has prohibited Art's desired use of his property—a concrete ongoing injury.

166.    Art is ready to retire and purchased his property as a retirement retreat. Each day that passes that he cannot build because of the rezoning he is losing the use and enjoyment of what is meant to be his retirement home during the years he (alongside his family) is most able to enjoy it.

167.  The value that Art places on his lot as the place he bought specifically for his retirement home has been destroyed by the rezoning. A lot on which he cannot build the one thing he bought it for is not the asset he purchased.

168.  Nor are any of the permitted uses in COR-zoned areas viable economic alternatives for Art. Even if he wanted to use it as such (he doesn't), the lot is not realistically developable for the high-intensity uses permitted in COR-zoned areas.

169.  Art's injuries flow directly and entirely from the rezoning—specifically the prohibition on building single-family homes in COR-zoned areas.

170.  Before the rezoning, Art's lot was zoned for residential use, and he could build his single-family home as of right. He could have simply built his dream home. He can no longer do that.

171.  Under the rezoning he cannot build his home at all. Nor is he eligible to get a variance or permit for his home.

172.  A declaration that, as applied to Art, the prohibition on building single-family homes in COR-zoned areas is unconstitutional and an injunction prohibiting the City from enforcing the prohibition against Art would directly redress Art's injuries.

173.  With such relief, Art could and would proceed with his plan to build the home.

174.  Through the City's irrational prohibition on building single-family homes in a neighborhood comprised entirely of single-family homes, Art is irreparably injured

30

by the ongoing deprivation of his constitutional rights to use his property as he sees fit and for his own traditional, ordinary, and harmless use.

## CONSTITUTIONAL VIOLATIONS

### Count I
### Fourteenth Amendment Due Process Clause

175. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 174 as if fully set forth herein.

176. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution protects every American's right to use and enjoy their property, subject only to regulations that are rationally related to a legitimate government purpose.

177. That means that for a zoning determination to be constitutionally valid, it must "bear a substantial relation" to the public health, safety, morals, or general welfare. *Nectow v. City of Cambridge*, 277 U.S. 183, 188 (1928).

178. The Supreme Court has recognized that a zoning classification may violate the Fourteenth Amendment's Due Process Clause if, as applied to a given property owner, it prevents a property's use for the only or most appropriate use. *Id.* at 187. A municipality may not abuse its zoning authority to prevent property owners from using their property in ways that are entirely compatible with the surrounding community.

179. That is precisely what North Port is doing here to Art.

31

180. The prohibition on building single-family homes in COR-zoned areas prevents Art from building a traditional, ordinary, and harmless use—a modest home—in a neighborhood of single-family homes.

181. Prohibiting single-family homes in a neighborhood composed entirely of single-family homes serves no legitimate government purpose. The prohibition bears no substantial relationship to the public health, safety, morals, or general welfare. It merely infringes on Art's rights to use his property for a harmless and compatible use, without drawing any commercial or mixed-use development into the area.

182. The prohibition on building single-family homes in COR-zoned areas does not directly or materially advance any sufficiently important government interest because all it does is prohibit one form of harmless and compatible development.

183. As a direct and proximate result of the City's prohibition on building single-family homes in COR-zoned areas, Art has no adequate legal, administrative, or other remedy by which to prevent the permanent and ongoing deprivation of his constitutional rights.

184. Unless the prohibition on building single-family homes in COR-zoned areas is declared invalid as applied to Art, and unless the City is enjoined from enforcing the prohibition against him, Art will continue to suffer great and irreparable harm.

## Count II

### Fourteenth Amendment Equal Protection Clause

185.   Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 174 as if fully set forth herein.

186.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution ensures that state entities cannot treat similarly situated land uses differently unless that different treatment is rationally related to a legitimate government interest.

187.   North Port lacks a rational basis for treating single-family residential uses differently than residential uses that occupy the same or similar footprint or are of the same or similar density.

188.   It is irrational for North Port to entirely prohibit building single-family homes in COR-zoned areas while permitting duplexes or triplexes of similar size or density.

189.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution also ensures that state entities cannot treat less disruptive and intensive uses worse than more disruptive and intensive uses unless the worse treatment is rationally related to a legitimate government interest.

190.   North Port lacks a rational basis for treating single-family residential uses worse than much more disruptive and intense uses—for example, nightclubs,

33

breweries, television stations, indoor shooting ranges, or multi-family residential uses of much larger size or much higher density.

191.   It is irrational for North Port to entirely prohibit building single-family homes in COR-zoned areas that have only ever had single-family homes while permitting uses that are significantly more disruptive and for which there is no infrastructure or demand.

192.   Prohibiting single-family homes in a neighborhood composed entirely of single-family homes and devoid of the infrastructure for the City's preferred higher intensity and density development serves no legitimate government purpose. The prohibition treats single-family residential uses worse than similar residential uses. And the prohibition also treats single-family residential uses worse than more disruptive and intensive uses despite the quiet character of the neighborhood.

193.   Treating single-family residential uses worse than other similar residential uses and worse than other more disruptive and intense uses does not directly or materially advance any sufficiently important government interest, because all it does is prohibit one form of harmless and compatible development, without drawing preferred development.

194.   As a direct and proximate result of the City's prohibition on building single-family residential uses while permitting other residential uses of the same or similar footprint or density, Art has no adequate legal, administrative, or other remedy

34

by which to prevent the permanent and ongoing deprivation of his constitutional rights.

195.    As a direct and proximate result of the City's prohibition on building single-family residential uses while permitting much more disruptive and intense uses, Art has no adequate legal, administrative, or other remedy by which to prevent the permanent and ongoing deprivation of his constitutional rights.

196.    Unless the prohibition on building single-family homes in COR-zoned areas is declared invalid as applied to Art, and unless the City is enjoined from enforcing the prohibition against him, Art will continue to suffer great and irreparable harm.

## PRAYER FOR RELIEF

Plaintiff respectfully asks the Court to grant the following relief:

A.    A declaratory judgment that, as applied to Arthur Yatsko, the prohibition on building single-family homes in COR-zoned areas violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

B.    A declaratory judgment that, as applied to Arthur Yatsko, the prohibition on building single-family homes in COR-zoned areas violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

C.    A permanent injunction prohibiting Defendant from enforcing the prohibition against Arthur Yatsko;

D.    $1.00 in nominal damages;

E.      Reasonable costs and attorneys' fees under 42 U.S.C. § 1988; and

F.      Such other legal or equitable relief as this Court may deem appropriate

and just.

## JURY DEMAND

Plaintiff demands a jury trial on all triable issues.


DATED this 9th day of June 2026.      Respectfully submitted,

/s/ Katrin Marquez
Katrin Marquez (FL Bar No. 1024765)*
Ari S. Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 S. Biscayne Blvd., Ste. 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org
abargil@ij.org

*Lead Counsel

Counsel for Plaintiff

36